(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CALIFORNIA ET AL. *v.* TEXAS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 19–840. Argued November 10, 2020—Decided June 17, 2021*

The Patient Protection and Affordable Care Act as enacted in 2010 required most Americans to obtain minimum essential health insurance coverage and imposed a monetary penalty upon most individuals who failed to do so. Amendments to the Act in 2017 effectively nullified the penalty by setting its amount to $0. Subsequently, Texas (along with over a dozen States and two individuals) brought suit against federal officials, claiming that without the penalty the Act's minimum essential coverage provision, codified at 26 U. S. C. §5000A(a), is unconstitutional. They sought a declaration that the provision is unconstitutional, a finding that the rest of the Act is not severable from §5000A(a), and an injunction against enforcement of the rest of the Act. The District Court determined that the individual plaintiffs had standing. It also found §5000A(a) both unconstitutional and not severable from the rest of the Act. The Fifth Circuit agreed as to the existence of standing and the unconstitutionality of §5000A(a), but concluded that the District Court's severability analysis provided insufficient justification to strike down the entire Act. Petitioner California and other States intervened to defend the Act's constitutionality and to seek further review.

*Held*: Plaintiffs do not have standing to challenge §5000A(a)'s minimum essential coverage provision because they have not shown a past or future injury fairly traceable to defendants' conduct enforcing the specific statutory provision they attack as unconstitutional. Pp. 4–16.

    (a) The Constitution gives federal courts the power to adjudicate

_____

*Together with No. 19–1019, *Texas et al.* v. *California et al.*, also on certiorari to the same court.

only genuine "Cases" and "Controversies." Art. III, §2. To have standing, a plaintiff must "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 342. No plaintiff has shown such an injury "fairly traceable" to the "allegedly unlawful conduct" challenged here. Pp. 4–5.

(b) The two individual plaintiffs claim a particularized individual harm in the form of past and future payments necessary to carry the minimum essential coverage that §5000A(a) requires. Assuming this pocketbook injury satisfies the injury element of Article III standing, it is not "fairly traceable" to any "allegedly unlawful conduct" of which the plaintiffs complain, *Allen* v. *Wright*, 468 U. S. 737, 751. Without a penalty for noncompliance, §5000A(a) is unenforceable. The individuals have not shown that any kind of Government action or conduct has caused or will cause the injury they attribute to §5000A(a). The Court's cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened enforcement, whether today or in the future. See, *e.g.*, *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298. Here, there is only the statute's textually unenforceable language.

Unenforceable statutory language alone is not sufficient to establish standing, as the redressability requirement makes clear. Whether an injury is redressable depends on the relationship between "the judicial relief requested" and the "injury" suffered. *Allen*, 468 U. S. at 753, n. 19. The only relief sought regarding the minimum essential coverage provision is declaratory relief, namely, a judicial statement that the provision challenged is unconstitutional. But just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement. See *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 126–127. Article III standing requires identification of a remedy that will redress the individual plaintiffs' injuries. *Id.*, at 127. No such remedy exists here. To find standing to attack an unenforceable statutory provision would allow a federal court to issue what would amount to an advisory opinion without the possibility of an Article III remedy. Article III guards against federal courts assuming this kind of jurisdiction. See *Carney* v. *Adams*, 592 U. S. ___, ___ . The Court also declines to consider Federal respondents' novel alternative theory of standing first raised in its merits brief on behalf the individuals, as well as the dissent's novel theory on behalf of the states, neither of which was directly argued by plaintiffs below nor presented at the certiorari stage. Pp. 5–10.

(c) Texas and the other state plaintiffs have similarly failed to show that the pocketbook injuries they allege are traceable to the Government's allegedly *unlawful* conduct. *DaimlerChrysler Corp.* v. *Cuno*,

547 U. S. 332, 342. They allege two forms of injury: one indirect, one direct.

(1) The state plaintiffs allege indirect injury in the form of increased costs to run state-operated medical insurance programs. They say the minimum essential coverage provision has caused more state residents to enroll in the programs. The States, like the individual plaintiffs, have failed to show how that alleged harm is traceable to the Government's actual or possible action in enforcing §5000A(a), so they lack Article III standing as a matter of law. But the States have also not shown that the challenged minimum essential coverage provision, without any prospect of penalty, will injure them by leading more individuals to enroll in these programs. Where a standing theory rests on speculation about the decision of an independent third party (here an individual's decision to enroll in a program like Medicaid), the plaintiff must show at the least "that third parties will likely react in predictable ways." *Department of Commerce* v. *New York*, 588 U. S. ___, ___. Neither logic nor evidence suggests that an unenforceable mandate will cause state residents to enroll in valuable benefits programs that they would otherwise forgo. It would require far stronger evidence than the States have offered here to support their counterintuitive theory of standing, which rests on a "highly attenuated chain of possibilities." *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 410–411. Pp. 11–14.

(2) The state plaintiffs also claim a direct injury resulting from a variety of increased administrative and related expenses allegedly required by §5000A(a)'s minimum essential coverage provision. But other provisions of the Act, not the minimum essential coverage provision, impose these requirements. These provisions are enforced without reference to §5000A(a). See 26 U. S. C. §§6055, 6056. A conclusion that the minimum essential coverage requirement is unconstitutional would not show that enforcement of these other provisions violates the Constitution. The other asserted pocketbook injuries related to the Act are similarly the result of enforcement of provisions of the Act that operate independently of §5000A(a). No one claims these other provisions violate the Constitution. The Government's conduct in question is therefore not "fairly traceable" to enforcement of the "allegedly unlawful" provision of which the plaintiffs complain—§5000A(a). *Allen*, 468 U. S., at 751. Pp. 14–16.

945 F. 3d. 355, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, SOTOMAYOR, KAGAN, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion. ALITO, J., filed a dissenting opinion, in which GORSUCH, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 19–840 and 19–1019

————

### CALIFORNIA, ET AL., PETITIONERS
19–840          *v.*
### TEXAS, ET AL.


### TEXAS, ET AL., PETITIONERS
19–1019          *v.*
### CALIFORNIA, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 17, 2021]

JUSTICE BREYER delivered the opinion of the Court.

As originally enacted in 2010, the Patient Protection and Affordable Care Act required most Americans to obtain minimum essential health insurance coverage. The Act also imposed a monetary penalty, scaled according to income, upon individuals who failed to do so. In 2017, Congress effectively nullified the penalty by setting its amount at $0. See Tax Cuts and Jobs Act of 2017, Pub. L. 115–97, §11081, 131 Stat. 2092 (codified in 26 U. S. C. §5000A(c)).

Texas and 17 other States brought this lawsuit against the United States and federal officials. They were later joined by two individuals (Neill Hurley and John Nantz). The plaintiffs claim that without the penalty the Act's minimum essential coverage requirement is unconstitutional. Specifically, they say neither the Commerce Clause nor the

Tax Clause (nor any other enumerated power) grants Congress the power to enact it.  See U. S. Const., Art. I, §8. They also argue that the minimum essential coverage requirement is not severable from the rest of the Act.  Hence, they believe the Act as a whole is invalid.  We do not reach these questions of the Act's validity, however, for Texas and the other plaintiffs in this suit lack the standing necessary to raise them.

## I

### A

We begin by describing the provision of the Act that the plaintiffs attack as unconstitutional.  The Act says in relevant part:

> **"(a)  Requirement to maintain minimum essential coverage**
>
> "An applicable individual shall . . . ensure that the individual, and any dependent . . . who is an applicable individual, is covered under minimum essential coverage . . . .
>
> **"(b)  Shared responsibility payment**
>   **"(1) In general**
>
> "If a taxpayer who is an applicable individual . . . fails to meet the requirement of subsection (a) . . . there is hereby imposed on the taxpayer a penalty . . . in the amount determined under subsection (c).
>
>   **"(2) Inclusion with return**
>
> "Any penalty imposed by this section . . . shall be included with a taxpayer's return . . . for the taxable year . . . ."  26 U. S. C. §5000A.

The Act defines "applicable individual" to include all taxpayers who do not fall within a set of exemptions.  See §5000A(d).  As first enacted, the Act set forth a schedule of penalties applicable to those who failed to meet its minimum essential coverage requirement.  See §5000A(c)

(2012). The penalties varied with a taxpayer's income and exempted, among others, persons whose annual incomes fell below the federal income tax filing threshold. See §5000A(e) (2012). And the Act required that those subject to a penalty include it with their annual tax return. See §5000A(b)(2) (2012). In 2017, Congress amended the Act by setting the amount of the penalty in each category in §5000A(c) to "$0," effective beginning tax year 2019. See §11081, 131 Stat. 2092.

Before Congress amended the Act, the Internal Revenue Service (IRS) had implemented §5000A(b) by requiring individual taxpayers to report with their federal income tax return whether they carried minimum essential coverage (or could claim an exemption). After Congress amended the Act, the IRS made clear that the statute no longer requires taxpayers to report whether they do, or do not, maintain that coverage. See IRS, Publication 5187, Tax Year 2019, p. 5 ("Form 1040 . . . will not have the 'full-year health care coverage or exempt' box and Form 8965, Health Coverage Exemptions, will no longer be used as the shared responsibility payment is reduced to zero").

## B

In 2018, Texas and more than a dozen other States (state plaintiffs) brought this lawsuit against the Secretary of Health and Human Services and the Commissioner of Internal Revenue, among others. App. 12, 34. They sought a declaration that §5000A(a)'s minimum essential coverage provision is unconstitutional, a finding that the rest of the Act is not severable from §5000A(a), and an injunction against the rest of the Act's enforcement. *Id.*, at 61–63. Hurley and Nantz (individual plaintiffs) soon joined them. Although nominally defendants to the suit, the United States took the side of the plaintiffs. See Brief for Federal Respondents 12–13 (arguing that the Act is unconstitutional). Therefore California, along with 15 other States

and the District of Columbia (state intervenors), intervened
in order to defend the Act's constitutionality, see App. 12–
13, as did the U. S. House of Representatives at the appel-
late stage, see *id.*, at 3.

After taking evidence, the District Court found that the
individual plaintiffs had standing to challenge the constitu-
tionality of the minimum essential coverage provision,
§5000A(a).  See *Texas* v. *United States*, 340 F. Supp. 3d 579,
593–595 (ND Tex. 2018).  The court held that the minimum
essential coverage provision is unconstitutional and not
severable from the rest of the Act.  It granted relief in the
form of a declaration stating just that.  *Id.,* at 595–619.  It
then stayed its judgment pending appeal.  See *Texas* v.
*United States*, 352 F. Supp. 3d 665 (ND Tex. 2018).

On appeal, a panel majority agreed with the District
Court that the plaintiffs had standing and that the mini-
mum essential coverage provision was unconstitutional.
See *Texas* v. *United States*, 945 F. 3d 355, 377–393 (CA5
2019).  It found that the District Court's severability anal-
ysis, however, was "incomplete."  *Id.,* at 400.  It wrote that
"[m]ore [wa]s needed to justify" the District Court's order
striking down the entire Act.  *Id.,* at 401.  And it remanded
the case for further proceedings.  *Id.,* at 402–403.

The state intervenors, defending the Act, asked us to re-
view the lower court decision.  We granted their petition for
certiorari.

## II

We proceed no further than standing.  The Constitution
gives federal courts the power to adjudicate only genuine
"Cases" and "Controversies."  Art. III, §2.  That power in-
cludes the requirement that litigants have standing.  A
plaintiff has standing only if he can "allege personal injury
fairly traceable to the defendant's allegedly unlawful con-
duct and likely to be redressed by the requested relief."
*DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 342 (2006)

(internal quotation marks omitted); see also *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992). Neither the individual nor the state plaintiffs have shown that the injury they will suffer or have suffered is "fairly traceable" to the "allegedly unlawful conduct" of which they complain.

## A

We begin with the two individual plaintiffs. They claim a particularized individual harm in the form of payments they have made and will make each month to carry the minimum essential coverage that §5000A(a) requires. The individual plaintiffs point to the statutory language, which, they say, commands them to buy health insurance. Brief for Respondent-Cross Petitioner Hurley et al. 19–20. But even if we assume that this pocketbook injury satisfies the injury element of Article III standing, see *Whitmore* v. *Arkansas*, 495 U. S. 149, 155 (1990), the plaintiffs nevertheless fail to satisfy the traceability requirement.

Their problem lies in the fact that the statutory provision, while it tells them to obtain that coverage, has no means of enforcement. With the penalty zeroed out, the IRS can no longer seek a penalty from those who fail to comply. See 26 U. S. C. §5000A(g) (setting out IRS enforcement only of the taxpayer's failure to pay the penalty, *not* of the taxpayer's failure to maintain minimum essential coverage). Because of this, there is no possible Government action that is causally connected to the plaintiffs' injury—the costs of purchasing health insurance. Or to put the matter conversely, that injury is not "fairly traceable" to any "allegedly unlawful conduct" of which the plaintiffs complain. *Allen* v. *Wright*, 468 U. S. 737, 751 (1984). They have not pointed to any way in which the defendants, the Commissioner of Internal Revenue and the Secretary of Health and Human Services, will act to enforce §5000A(a). They have not shown how any other federal employees could do so either. In a word, they

have not shown that any kind of Government action or conduct has caused or will cause the injury they attribute to §5000A(a).

The plaintiffs point to cases concerning the Act that they believe support their standing. But all of those cases concerned the Act when the provision was indisputably *enforceable*, because the penalty provision was still in effect. See Brief for Respondent-Cross Petitioner Hurley et al. 22 (citing *Florida ex rel. Atty. Gen.* v. *United States Dept. of Health and Human Servs.*, 648 F. 3d 1235, 1243 (CA11 2011); *Thomas More Law Center* v. *Obama*, 651 F. 3d 529, 535 (CA6 2011); *Virginia ex rel. Cuccinelli* v. *Sebelius*, 656 F. 3d 253, 266–268 (CA4 2011)); cf. *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519 (2012) (assessing the constitutionality of the Act *with* the penalty provision). These cases therefore tell us nothing about how the statute is enforced, or could be enforced, today.

It is consequently not surprising that the plaintiffs cannot point to cases that support them. To the contrary, our cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement*, whether today or in the future. See, *e.g., Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's *operation or enforcement*" (emphasis added)); *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 392 (1988) (requiring "threatened or actual injury resulting from the putatively illegal action" (internal quotation marks omitted)). In the absence of contemporary enforcement, we have said that a plaintiff claiming standing must show that the likelihood of future enforcement is "substantial." *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 164 (2014); see also *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923) ("The party who invokes the power [of Article III courts] must be able to show, not only that the statute is invalid, but that

he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement").

The plaintiffs point out that these and other precedents concern injuries anticipated in the future from a statute's later enforcement. Here, the plaintiffs say, they have already suffered a pocketbook injury, for they have already bought health insurance. They also emphasize the Court's statement in *Lujan* that, when a plaintiff is the "'object'" of a challenged Government action, "'there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it.'" Brief for Respondent-Cross Petitioner Hurley et al. 18 (quoting *Lujan*, 504 U. S., at 561–562). But critically, unlike *Lujan,* here no unlawful Government action "fairly traceable" to §5000A(a) caused the plaintiffs' pocketbook harm. Here, there is no action—actual or threatened—whatsoever. There is only the statute's textually unenforceable language.

To consider the matter from the point of view of another standing requirement, namely, redressability, makes clear that the statutory language alone is not sufficient. To determine whether an injury is redressable, a court will consider the relationship between "the judicial relief requested" and the "injury" suffered. *Allen*, 468 U. S., at 753, n. 19. The plaintiffs here sought injunctive relief and a declaratory judgment. The injunctive relief, however, concerned the Act's other provisions that they say are inseverable from the minimum essential coverage requirement. The relief they sought in respect to the only provision they attack as unconstitutional—the minimum essential coverage provision—is declaratory relief, namely, a judicial statement that the provision they attacked is unconstitutional. See App. 61–63 ("Count One: Declaratory Judgment That the Individual Mandate of the ACA Exceeds Congress's Article I Constitutional Enumerated Powers" (boldface deleted)); 340 F. Supp. 3d, at 619 (granting declaratory

judgment on count I as to §5000A(a)); 352 F. Supp. 3d, at 690 (severing and entering partial final judgment on count I).

Remedies, however, ordinarily "operate with respect to specific parties." *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___, ___ (2018) (THOMAS, J., concurring) (slip op., at 3) (internal quotation marks omitted). In the absence of any specific party, they do not simply operate "on legal rules in the abstract." *Ibid.* (internal quotation marks omitted); see also *Mellon*, 262 U. S., at 488 ("If a case for preventive relief be presented, the court enjoins, in effect, not the execution of the statute, but the acts of the official, the statute notwithstanding").

This suit makes clear why that is so. The Declaratory Judgment Act, 28 U. S. C. §2201, alone does not provide a court with jurisdiction. See *Skelly Oil Co.* v. *Phillips Petroleum Co.*, 339 U. S. 667, 671–672 (1950); R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 841 (7th ed. 2015) (that Act does "not confe[r] jurisdiction over declaratory actions when the underlying dispute could not *otherwise* be heard in federal court"); see also *Poe* v. *Ullman*, 367 U. S. 497, 506 (1961) ("[T]he declaratory judgment device does not . . . permit litigants to invoke the power of this Court to obtain constitutional rulings in advance of necessity"). Instead, just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement. See *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 126–127 (2007). At a minimum, this means that the dispute must "be 'real and substantial' and 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *Id.*, at 127 (alteration omitted). Thus, to satisfy Article III standing, we must look elsewhere to find a remedy that will redress the individual plaintiffs' injuries.

What is that relief? The plaintiffs did not obtain damages. Nor, as we just said, did the plaintiffs obtain an injunction in respect to the provision they attack as unconstitutional. But, more than that: How could they have sought any such injunction? The provision is unenforceable. There is no one, and nothing, to enjoin. They cannot enjoin the Secretary of Health and Human Services, because he has no power to enforce §5000A(a) against them. And they do not claim that they might enjoin Congress. In these circumstances, injunctive relief could amount to no more than a declaration that the statutory provision they attack is unconstitutional, *i.e.,* a declaratory judgment. But once again, that is the very kind of relief that cannot alone supply jurisdiction otherwise absent. See *Nashville, C. & St. L. R. Co.* v. *Wallace*, 288 U. S. 249, 262 (1933) (inquiring whether a suit for declaratory relief "would be justiciable in this Court if presented in a suit for injunction"); *Medtronic, Inc.* v. *Mirowski Family Ventures, LLC*, 571 U. S. 191, 197 (2014) (noting that a court looks to "the nature of the threatened action in the absence of the declaratory judgment suit" to determine whether jurisdiction exists).

The matter is not simply technical. To find standing here to attack an unenforceable statutory provision would allow a federal court to issue what would amount to "an advisory opinion without the possibility of any judicial relief." *Los Angeles* v. *Lyons*, 461 U. S. 95, 129 (1983) (Marshall, J., dissenting); see also *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 107 (1998) (to have standing, a plaintiff must seek "an acceptable Article III remedy" that will "redress a cognizable Article III injury"). It would threaten to grant unelected judges a general authority to conduct oversight of decisions of the elected branches of Government. See *United States* v. *Richardson,* 418 U. S. 166, 188 (1974) (Powell, J., concurring). Article III guards against federal courts assuming this kind of jurisdiction. See *Carney* v. *Adams*, 592 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 4).

Last, the federal respondents raised for the first time a novel alternative theory of standing on behalf of the individual plaintiffs in their merits brief. (The dissent, alone, puts forward a similar novel theory on behalf of the state plaintiffs.) That theory was not directly argued by the plaintiffs in the courts below, see 945 F. 3d, at 385–386, and n. 29, and was nowhere presented at the certiorari stage. We accordingly decline to consider it. Cf. *Adarand Constructors, Inc.* v. *Mineta*, 534 U. S. 103, 109–110 (2001) (*per curiam*); see also *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

## B

Next, we turn to the state plaintiffs. We conclude that Texas and the other state plaintiffs have similarly failed to show that they have alleged an "injury fairly traceable to the defendant's allegedly *unlawful* conduct." *Cuno*, 547 U. S., at 342 (internal quotation marks omitted; emphasis added). They claim two kinds of pocketbook injuries. First, they allege an indirect injury in the form of the increased use of (and therefore cost to) state-operated medical insurance programs. Second, they claim a direct injury resulting from a variety of increased administrative and related expenses required, they say, by the minimum essential coverage provision, along with other provisions of the Act that, they add, are inextricably "'interwoven'" with it. Brief for Respondent-Cross Petitioner States 39.

### 1

First, the state plaintiffs claim that the minimum essential coverage provision has led state residents subject to it to enroll in state-operated or state-sponsored insurance programs such as Medicaid, see 42 U. S. C. §§1396–1396w, the Children's Health Insurance Program (CHIP), see §1397aa, and health insurance programs for state employees. The state plaintiffs say they must pay a share of the

costs of serving those new enrollees. As with the individual plaintiffs, the States also have failed to show how this injury is directly traceable to any actual or possible unlawful Government conduct in enforcing §5000A(a). Cf. *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 414, n. 5 (2013) ("plaintiffs bear the burden of . . . showing that the defendant's *actual action* has caused the substantial risk of harm" (emphasis added)). That alone is enough to show that they, like the individual plaintiffs, lack Article III standing.

But setting aside that pure issue of law, we need only examine the initial factual premise of their claim to uncover another fatal weakness: The state plaintiffs have failed to show that the challenged minimum essential coverage provision, without any prospect of penalty, will harm them by leading more individuals to enroll in these programs.

We have said that, where a causal relation between injury and challenged action depends upon the decision of an independent third party (here an individual's decision to enroll in, say, Medicaid), "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish" *Lujan*, 504 U. S., at 562 (quoting *Allen*, 468 U. S., at 758); see also *Clapper*, 568 U. S., at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). To satisfy that burden, the plaintiff must show at the least "that third parties will likely react in predictable ways." *Department of Commerce* v. *New York*, 588 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 10). And, "at the summary judgment stage, such a party can no longer rest on . . . mere allegations, but must set forth . . . specific facts" that adequately support their contention. *Clapper*, 568 U. S., at 411–412 (internal quotation marks omitted). The state plaintiffs have not done so.

The programs to which the state plaintiffs point offer their recipients many benefits that have nothing to do with the minimum essential coverage provision of §5000A(a). See, *e.g.,* 42 U. S. C. §§1396*o*(a)–(b) (providing for no-cost

Medicaid services furnished to children and pregnant women, and for emergency services, hospice care, and COVID–19 testing related services, among others, as well as "nominal" charges for other individuals and services); §1396*o*(c) (prohibiting Medicaid premiums for certain individuals with family income below 150 percent of the poverty line and capping the premium at 10 percent of an eligible individual's family income above that line); 26 U. S. C. §36B(c)(2)(C) (providing premium tax credits to make health insurance plans, including employer-sponsored plans, more affordable). Given these benefits, neither logic nor intuition suggests that the presence of the minimum essential coverage requirement would lead an individual to enroll in one of those programs that its absence would lead them to ignore. A penalty might have led some inertia-bound individuals to enroll. But without a penalty, what incentive could the provision provide?

The evidence that the state plaintiffs introduced in the District Court does not show the contrary. That evidence consists of 21 statements (from state officials) about how new enrollees will increase the costs of state health insurance programs, see App. 79–191, 339–363, along with one statement taken from a 2017 Congressional Budget Office (CBO) Report, see *id.,* at 306–311.

Of the 21 statements, we have found only 4 that allege that added state costs are attributable to the minimum essential coverage requirement. And all four refer to that provision as it existed *before Congress removed the penalty* effective beginning tax year 2019, *i.e.,* while a penalty still existed to be enforced. See *id.,* at 147–148 (decl. of Drew L. Snyder) (noting "[e]fforts to avoid imposition of the fine likely prompted more individuals to seek Medicaid from [Mississippi]"); *id.,* at 154 (decl. of Jennifer R. Tidball) (noting that "Missouri residents were required to seek health care coverage or pay a penalty to the federal government," and while "it is difficult to quantify the exact number of

Medicaid enrollees that can be attributed to the [Act], during the time period the [Act] was implemented the Medicaid caseload increased"); *id.,* at 341–342 (decl. of Blake Fulenwider) (observing that "Georgia residents were necessarily required to secure health care coverage or pay a fine to the federal government" and stating that "I believe that the individual mandate played a substantial role in the increase in the number of Medicaid recipients since 2011"); *id.,* at 139 (decl. of Mike Michael) (describing costs associated with "[p]lan changes to cover individual mandate" spread "over the years of 2013 to 2018").

One other declaration refers to increased costs to the States as employers, but it is vague as to the time period at issue. See *id.,* at 347–348 (decl. of Teresa MacCartney) ("After the implementation of the [Act]'s individual mandate, [Georgia's Department of Community Health] experienced a substantial increase in employee elections to obtain health insurance").

The state plaintiffs emphasize one further piece of evidence, a CBO Report released in 2017. See *id.,* at 306–311. At that time, Congress was considering whether to repeal the minimum essential coverage provision or, instead, simply set the penalty for failure to obtain coverage to $0 for all taxpayers. The state plaintiffs focus on the paragraph of the CBO Report that says that either way, the result would be "very similar," for "only a small number of people" would continue to enroll in health insurance solely out of a "willingness to comply with the law." *Id.,* at 307. And they argue that a "small number" is sufficient (by raising costs in furnishing Medicaid and CHIP) to provide them with standing.

In our view, however, this predictive sentence without more cannot show that the minimum essential coverage provision was the cause of added enrollment to state health plans. It does not explain, for example, who would buy insurance that they would not otherwise have bought. (For

example, individuals who purchase insurance on individual exchanges—like individual plaintiffs Hurley and Nantz— do not increase the relevant costs to the States of furnishing coverage.) Nor does it explain *why* they might do so. The CBO statement does not adequately trace the necessary connection between the provision without a penalty and new enrollment in Medicaid and CHIP. We have found no other significant evidence that might keep the CBO statement company.

Unsurprisingly, the States have not demonstrated that an unenforceable mandate will cause their residents to enroll in valuable benefits programs that they would otherwise forgo. It would require far stronger evidence than the States have offered here to support their counterintuitive theory of standing, which rests on a "highly attenuated chain of possibilities." *Clapper*, 568 U. S., at 410–411; cf. *Department of Commerce*, 588 U. S., at ___–___ (slip op., at 10–11) (District Court did not clearly err in finding that plaintiffs had standing where plaintiffs relied not only on "the *predictable effect of Government action* on the decisions of third parties" but also on comprehensive studies, rather than mere "speculation" (emphasis added)).

2

The state plaintiffs add that §5000A(a)'s minimum essential coverage provision also causes them to incur additional costs directly. They point to the costs of providing beneficiaries of state health plans with information about their health insurance coverage, as well as the cost of furnishing the IRS with that related information. See Brief for Respondent/Cross-Petitioner States 20–22 (citing 26 U. S. C. §§6055, 6056).

The problem with these claims, however, is that other provisions of Act, not the minimum essential coverage provision, impose these other requirements. Nothing in the text of these form provisions suggests that they would not

operate without §5000A(a). See §§6055(b)(1)(B)(iii)(II), (c)(1) (requiring certification as to whether the beneficiary's plan qualifies for cost-sharing or premium tax credits under §36B); §§6056(b)(2)(B), (c)(1) (requiring certification as to whether the plan qualifies as an "eligible employer-sponsored plan" that satisfies §4980H's employer mandate). These provisions refer to §5000A *only* to pick up a different subsection's *definition* of "minimum essential coverage." See 26 U. S. C. §§6055(e), 6056(b)(2)(B) (incorporating §5000A(f)'s definition of "minimum essential coverage"). To show that the minimum essential coverage requirement is unconstitutional would not show that enforcement of any of these other provisions violates the Constitution. The state plaintiffs do not claim the contrary. The Government's conduct in question is therefore not "fairly traceable" to enforcement of the "allegedly unlawful" provision of which the plaintiffs complain—§5000A(a). *Allen*, 468 U. S., at 751.

The state plaintiffs complain of other pocketbook injuries. They say, for example, that, in order to avoid a "substantial tax penalty," they will have to "offer their full-time employees (and qualified dependents) minimum essential coverage under an eligible employer-sponsored plan." Brief for Respondent/Cross-Petitioner States 23 (internal quotation marks omitted). They say that the Act's insistence that they "expand Medicaid eligibility" has led to "increas[ed] . . . Medicaid expenditures." *Ibid.* And they argue that "the [Act]'s vast and complex rules and regulations" will require additional expenditures. *Id.,* at 22–23 (citing App. 152–153, 174, 190–191). They seem to argue that they will have to pay more to expand coverage for employees who work 30–39 hours per week, see App. 174, and for those who become too old to remain in foster care, see *id.,* at 152–153.

Again, the problem for the state plaintiffs is that these other provisions also operate independently of §5000A(a). See 26 U. S. C. §4980H(a) (establishing an employer mandate); §4980H(c)(4) (establishing employee eligibility for

employer health plans for employees working 30–39 hours per week); 42 U. S. C. §1396a(a)(10)(A)(i)(IX) (providing continuing Medicaid coverage for those aged out of foster care). At most, those provisions pick up only §5000A(f)'s definition of minimum essential coverage in related subsections. No one claims these other provisions violate the Constitution. Rather, the state plaintiffs attack the constitutionality of only the minimum essential coverage provision. They have not alleged that they have suffered an "injury fairly traceable to the defendant's allegedly unlawful conduct." *Cuno*, 547 U. S., at 342 (quoting *Allen*, 468 U. S., at 751).

\*　　\*　　\*

For these reasons, we conclude that the plaintiffs in this suit failed to show a concrete, particularized injury fairly traceable to the defendants' conduct in enforcing the specific statutory provision they attack as unconstitutional. They have failed to show that they have standing to attack as unconstitutional the Act's minimum essential coverage provision. Therefore, we reverse the Fifth Circuit's judgment in respect to standing, vacate the judgment, and remand the case with instructions to dismiss.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–840 and 19–1019

_____

### CALIFORNIA, ET AL., PETITIONERS
19–840　　　　　　　　　*v.*
### TEXAS, ET AL.


### TEXAS, ET AL., PETITIONERS
19–1019　　　　　　　　　*v.*
### CALIFORNIA, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 17, 2021]

JUSTICE THOMAS, concurring.

There is much to commend JUSTICE ALITO's account of "our epic Affordable Care Act trilogy." *Post*, at 1 (dissenting opinion). This Court has gone to great lengths to rescue the Act from its own text. *Post,* at 1–2. So have the Act's defenders, who argued in first instance that the individual coverage mandate is the Act's linchpin, yet now, in an about-face, contend that it is just a throwaway sentence.

But, whatever the Act's dubious history in this Court, we must assess the current suit on its own terms. And, here, there is a fundamental problem with the arguments advanced by the plaintiffs in attacking the Act—they have not identified any unlawful action that has injured them. *Ante*, at 5, 11, 14–16. Today's result is thus not the consequence of the Court once again rescuing the Act, but rather of us adjudicating the particular claims the plaintiffs chose to bring.

## I

This Court first encountered the Act in 2011. That case

involved the constitutionality of the Act's individual coverage mandate. *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 530 (2012). Despite correctly recognizing that Congress' enumerated powers did not allow it to impose such a mandate, the Court nonetheless upheld it by characterizing the "financial penalty" imposed on those who failed to comply with the mandate as a "tax." *Id.,* at 574.

That curious approach left us with no need to address a subsidiary question on which we had also granted review: whether the Act was inseverable from the mandate and thus would need to fall if the mandate were unconstitutional. The parties challenging the law argued "yes." And the Government agreed in part. It stressed that the mandate could not be severed from two other important features of the Act: the "guaranteed-issue" provision—which bars insurers from denying coverage based on medical conditions or history—and the "community-rating" provision—which bars insurers from charging individuals higher premiums for similar reasons. Brief for Respondents in *National Federation of Independent Business* v. *Sebelius*, O. T. 2011, No. 11–393, pp. 44–54; see 42 U. S. C. §§300gg–1, 300gg–3, 300gg–4(a), 300gg(a)(1), 300gg–4(b).

According to the Government, the mandate was "necessary to make those [other] reforms effective." Brief for Respondents in No. 11–393, at 44. It noted that "Congress's findings expressly state that enforcement of those provisions without a minimum coverage provision would *restrict* the availability of health insurance and make it *less* affordable—the opposite of Congress's goals in enacting the Affordable Care Act." *Id.,* at 44–45; see §§18091(2)(H)–(J). And as JUSTICE ALITO discusses in more detail, at the time we decided *NFIB*, "it was widely thought that without the mandate much of the Act—and perhaps even the whole scheme—would collapse." *Post*, at 1, 27–29.

This Court also embraced that view when we reencountered the Act in 2015. *King* v. *Burwell*, 576 U. S. 473. Saving the Act again through a feat of linguistic ingenuity—this time by redefining "State" to mean "'State or the Federal Government,'" *id.*, at 498 (Scalia, J., dissenting)—the Court explained that "Congress [had] found that the guaranteed issue and community rating requirements would not work without the [mandate]," *id.,* at 482; see also *post*, at 5 (ALITO, J., dissenting).

But times have changed. In this suit, the plaintiffs assert that the mandate is unconstitutional because it no longer imposes financial consequences and thus cannot be justified as a tax. And given that the mandate is unconstitutional, *other* portions of the Act that actually harm the plaintiffs must fall with it. In response to this theory, the current administration contends that the mandate can be severed from the rest of the Act. Letter from E. Kneedler, Deputy Solicitor General, to S. Harris, Clerk of Court (Feb. 10, 2021) (notifying the Court of the Federal Government's change in position). The Act's other defenders agree. Brief for Petitioners 35–49. In other words, those who would preserve the Act must reverse course and argue that the mandate has transformed from the cornerstone of the law into a standalone provision.

II

On all of this JUSTICE ALITO and I agree. Where we part ways is on the relief to which the plaintiffs are entitled. The Constitution gives this Court only the power to resolve "Cases" or "Controversies." Art. III, §2. As everyone agrees, we have interpreted this language to require a plaintiff to present an injury that is traceable to a particular "unlawful" action. *Ante,* at 5, 11, 14–16; *post*, at 9–10 (ALITO, J., dissenting). And in light of the specific theories and arguments advanced in this suit, I do not believe that

the plaintiffs have carried this burden. As the majority explains in detail, the individual plaintiffs allege only harm caused by the bare existence of an unlawful statute that does not impose any obligations or consequences. *Ante*, at 5–10. That is not enough. The state plaintiffs' arguments fail for similar reasons. Although they claim harms flowing from enforcement of certain parts of the Act, they attack only the lawfulness of a *different* provision. None of these theories trace a clear connection between an injury and unlawful conduct.

JUSTICE ALITO does not contest that analysis. Rather, he argues that the state plaintiffs can establish standing another way: through "inseverability." *Post*, at 15 ("First, [the States] contend that the individual mandate is unconstitutional . . . . Second, they argue that costly obligations imposed on them by other provisions of the ACA cannot be severed from the mandate. If both steps of the States' argument that the challenged enforcement actions are unlawful are correct, it follows that the Government cannot lawfully enforce those obligations against the States"). This theory offers a connection between harm and unlawful conduct. And, it might well support standing in some circumstances, as it has some support in history and our case law. See *post,* at 16–20; Lea, Situational Severability, 103 Va. L. Rev. 735, 764–776 (2017).

But, I do not think we should address this standing-through-inseverability argument for several reasons. First, the plaintiffs did not raise it below, and the lower courts did not address it in any detail. 945 F. 3d 355, 386, n. 29 (CA5 2019). That omission is reason enough not to address this theory because "'we are a court of review, not of first view.'" *Brownback* v. *King*, 592 U. S. ___, ___, n. 4 (2021) (slip op., at 5, n. 4). Second, the state plaintiffs did not raise this theory in their opening brief before this Court, see Brief for

Respondent/Cross-Petitioner States 18–30,[1] and they did not even clearly raise it in reply.[2]  Third, this Court has not addressed standing-through-inseverability in any detail, largely relying on it through implication.  See *post*, at 16–20; *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings . . . have no precedential effect").  And fourth, this Court has been inconsistent in describing whether inseverability is a remedy or merits question.  To the extent the parties seek inseverability as a remedy, the Court is powerless to grant that relief.  See *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 3–4) (THOMAS, J., concurring); see also *Barr* v. *American Assn. of Political Consultants*, 591 U. S. \_\_\_, \_\_\_, n. 8 (2020)

—————

[1] The States instead raised the two pocketbook injury theories discussed by the Court, *ante*, at 10; Brief for Respondent/Cross-Petitioner States 19–28, along with another irrelevant theory.  Both theories focused only on the mandate's unlawfulness.  The dissent points to certain language arguably touching on standing-through-inseverability, *post*, at 13–14, but I respectfully disagree.  That language addresses a different theory—the argument that the unlawful mandate harms the States by increasing the cost of complying with other Act provisions, such as reporting requirements relating to the mandate.  *Ante*, at 14–16; Brief for Respondent/Cross-Petitioner States 20–25 (discussing how "the individual mandate itself increased the costs to state respondents in at least six ways" (brackets and internal quotation marks omitted)).  As the Court notes, "[n]o one claims these other provisions violate the Constitution." *Ante*, at 16.  And, the Court does not address the argument that these provisions are otherwise unlawful.  *Ante*, at 10 ("declin[ing] to consider" the standing-through-inseverability theory raised by the dissent "on behalf of the state plaintiffs").

[2] This lack of legal development is particularly significant because standing-through-inseverability—assuming it is a legitimate theory of standing—is fundamentally a merits-like exercise that requires courts to apply ordinary principles of statutory interpretation to determine if it is at least "arguable" that a statute links the lawfulness of one provision to the lawfulness of another.  See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 89 (1998).  Thus, a failure to develop a standing-through-inseverability argument poses a significant obstacle to review.

(plurality opinion) (slip op., at 16, n. 8).  Thus, standing-through-inseverability could only be a valid theory of standing to the extent it treats inseverability as a merits exercise of statutory interpretation.  See *Post*, at 15–16 (ALITO, J., dissenting); Lea, *supra*, at 764–776.  But petitioners have proposed no such theory.

*    *    *

The plaintiffs failed to demonstrate that the harm they suffered is traceable to unlawful conduct.  Although this Court has erred twice before in cases involving the Affordable Care Act, it does not err today.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–840 and 19–1019

_____

CALIFORNIA, ET AL., PETITIONERS
19–840　　　　　　　　*v.*
TEXAS, ET AL.

TEXAS, ET AL., PETITIONERS
19–1019　　　　　　　　*v.*
CALIFORNIA, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 17, 2021]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, dissenting.

Today's decision is the third installment in our epic Affordable Care Act trilogy, and it follows the same pattern as installments one and two. In all three episodes, with the Affordable Care Act facing a serious threat, the Court has pulled off an improbable rescue.

In the opening installment, *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519 (2012) (*NFIB*), the Court saved the so-called "individual mandate," the same critical provision at issue in today's suit. At that time, the individual mandate imposed a "penalty" on most Americans who refused to purchase health insurance or enroll in Medicaid, see 26 U. S. C. §5000A (2012 ed.), and it was widely thought that without the mandate much of the Act—and perhaps even the whole scheme—would collapse. The Government's principal defense of the mandate was that it represented a lawful exercise of Congress's power to regulate interstate commerce, see U. S. Const., Art. I, §8, cl. 3,

but the Court rejected that unprecedented argument, see 567 U. S., at 572 (opinion of the Court); *id.*, at 561 (opinion of ROBERTS, C. J.); *id.*, at 648 (joint dissent of Scalia, Kennedy, THOMAS, and ALITO, JJ.). That might have foretold doom, but then, in a stunning turn of events, the threat to the ACA was defused when the "penalty" for failing to comply with the mandate was found to be a "tax" and thus to be justified as an exercise of Congress's taxing power. *Id.*, at 575 (opinion of ROBERTS, C. J.); see also *id.*, at 574 (opinion of the Court); see U. S. Const., Art. I, §8, cl. 1. By a vote of 5 to 4, the individual mandate—and with it the rest of the ACA—lived on.

In the next installment, *King* v. *Burwell*, 576 U. S. 473 (2015), the Court carried out an equally impressive rescue. One of the Act's key provisions provided subsidies to persons purchasing insurance through exchanges established by a "State." 26 U. S. C. §§36B(b)–(c) (2012 ed.). When many States refused to establish such exchanges, the Federal Government did so instead. But the critical subsidies were seemingly unavailable on those exchanges, which had not been established by a "State" in any conventional sense of the term. Once again, some feared that the Act was in mortal danger, but the Court came to the rescue by finding that the Federal Government is a "State." 576 U. S., at 484–498.

Now, in the trilogy's third episode, the Court is presented with the daunting problem of a "tax" that does not tax. Can the taxing power, which saved the day in the first episode, sustain such a curious creature? In 2017, Congress reduced the "tax" imposed on Americans who failed to abide by the individual mandate to $0. With that move, the slender reed that supported the decision in *NFIB* was seemingly cut down, but once again the Court has found a way to protect the ACA. Instead of defending the constitutionality of the individual mandate, the Court simply ducks the issue and holds that none of the Act's challengers, including the 18

States that think the Act saddles them with huge financial costs, is entitled to sue.

Can this be correct? The ACA imposes many burdensome obligations on States in their capacity as employers, and the 18 States in question collectively have more than a million employees.[1] Even $1 in harm is enough to support standing. Yet no State has standing?

In prior cases, the Court has been selectively generous in allowing States to sue. Just recently, New York and certain other States were permitted to challenge the inclusion of a citizenship question in the 2020 census even though any effect on them depended on a speculative chain of events. See *Department of Commerce* v. *New York*, 588 U. S. \_\_\_, \_\_\_–\_\_\_ (2019) (slip op., at 9–11). The States' theory was that the citizenship question might cause some residents to violate their obligation to complete a census questionnaire and that this, in turn, might decrease the States' allocation of House seats and their share of federal funds. *Id.,* at \_\_\_ (slip op., at 9).

Last Term, Pennsylvania and New Jersey were permitted to contest a rule exempting the Little Sisters of the Poor and other religious employers from the ACA's contraceptive mandate. *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. \_\_\_ (2020). There, the theory was that some affected employees might not be able to afford contraceptives and might therefore turn to state-funded sources to pay for their contraceptives or the expenses of an unwanted pregnancy.[2] Some years ago, Massachusetts was allowed to sue (and force the Environmental

———————

[1] See Dept. of Commerce, Bureau of Census, 2020 Annual Survey of Public Employment & Payroll Datasets, State Government Employment & Payroll Data (May 2021), www.census.gov/data/datasets/2020/econ/apes/annual-apes.html.

[2] See *Pennsylvania* v. *President of United States*, 930 F. 3d 543, 561–565 (CA3 2019). Although our opinion did not address the issue, we are required to consider Article III standing in every case that comes before

Protection Agency (EPA) to regulate greenhouse gases) on the theory that failure to do so would cause the ocean to rise and reduce the size of the Commonwealth. See *Massachusetts* v. *EPA*, 549 U. S. 497, 521–526 (2007). On the other hand, when Texas recently tried to sue to press different legal issues in an original action, the Court would not even allow it to file its complaint. See *Texas* v. *California, post,* p. ___ (ALITO, J., dissenting).

In this suit, as I will explain, Texas and the other state plaintiffs have standing, and now that the "tax" imposed by the individual mandate is set at $0, the mandate cannot be sustained under the taxing power. As a result, it is clearly unconstitutional, and to the extent that the provisions of the ACA that burden the States are inextricably linked to the individual mandate, they too are unenforceable.

## I
### A

The Patient Protection and Affordable Care Act (ACA), 124 Stat. 119, comprehensively reengineered our country's healthcare laws. The Act itself totals 906 pages, and thousands of pages of regulations have been issued to implement it. At its core, the ACA includes a series of "closely interrelated" provisions, *NFIB*, 567 U. S., at 691 (joint dissent), that impose a bevy of new legal obligations on individuals, insurers, employers, and States.

A critical component of the Act's design was the individual mandate, which provides that each "applicable individual shall . . . ensure that the individual . . . is covered under minimum essential coverage." 26 U. S. C. §5000A(a). Originally, most individuals who were subject to but disobeyed this command were liable for what the Act called a "[s]hared responsibility payment" or "penalty." §5000A(b). The individual mandate was "closely intertwined" with

––––––––––
us. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 95 (1998).

other critical provisions, *King*, 576 U. S., at 482, including the critical "guaranteed issue" and "community rating" provisions, which ensured that individuals with preexisting medical conditions would not be denied coverage or pay unusually high premiums. See, *e.g.,* 42 U. S. C. §§300gg, 300gg–1(a). Put simply, "Congress found that the guaranteed issue and community rating requirements would not work without the" individual mandate. *King*, 576 U. S., at 482.

Several additional features of the ACA are important in this suit. First, certain employers, including the state plaintiffs, must offer employees the opportunity to enroll in costly "minimum essential [healthcare] coverage," and the Act demands that such plans cover an employee's dependent children until they turn 26. 26 U. S. C. §4980H; 42 U. S. C. §300gg–14. Most employers that fail to offer this coverage are subject to a hefty penalty of thousands of dollars per employee. 26 U. S. C. §§4980H(a), (b), (c)(1).

The ACA also imposes burdensome reporting requirements on certain employers like the state plaintiffs. See §§6055, 6056. Under §6055 of the Internal Revenue Code, employers that "provid[e] minimum essential coverage" must submit documentation every year to both the Internal Revenue Service and the covered individuals. §§6055(a)–(c). Section 6056 imposes similar reporting obligations on "[e]very applicable large employer" subject to the employer mandate. See §§6056(a)–(c). Failure to satisfy these reporting requirements can result in substantial monetary penalties. See §§6721, 6722.

B

Although the ACA survived this Court's decisions in *NFIB* and *King*, it remained controversial, and in 2017, a major effort was made to repeal much of it. A bill to do just that passed the House of Representatives in May, but soon after failed in the Senate. See American Health Care Act

of 2017, H. R. 1628, 115th Cong., 1st Sess. (2017). Later
that year, the two Chambers compromised in the Tax Cuts
and Jobs Act (TCJA), Pub. L. 115–97, 131 Stat. 2054, which
set the amount of the "tax" imposed for noncompliance with
the individual mandate at "[z]ero percent" and "$0."
§11081, 131 Stat. 2092 (amending 26 U. S. C. §5000A).
What the *NFIB* Court had salvaged as a "tax" could now
raise no revenue.

## C

After the enactment of the TCJA, Texas and 17 other
States brought suit against the United States, the Commis-
sioner of the IRS, the IRS, the Secretary of Health and Hu-
man Services, and the Department of Health and Human
Services to challenge the ACA.[3] The state plaintiffs identi-
fied many expenses imposed on them by the ACA, and they
sought declaratory and injunctive relief. In their view, the
individual mandate could no longer be sustained as a "tax,"
and the remainder of the ACA was unenforceable because
it was inseparable from that unconstitutional provision.
Soon thereafter, two individuals joined the States as plain-
tiffs. California, 15 other States, and the District of Colum-
bia intervened to defend the ACA.[4] For its part, the Federal
Government agreed that the individual mandate was un-
constitutional but argued that it was severable from almost

———————

[3] These States were Alabama, Arizona, Arkansas, Florida, Georgia,
Indiana, Kansas, Louisiana, Mississippi (via its Governor), Missouri, Ne-
braska, North Dakota, South Carolina, South Dakota, Tennessee, Utah,
and West Virginia. The State of Wisconsin was also a plaintiff in District
Court but has since been voluntarily dismissed from the suit. Former
Maine Governor Paul LePage attempted to represent Maine as a plaintiff
in the District Court, but was subsequently dismissed from the lawsuit.

[4] The state intervenors are California, Connecticut, Delaware, Hawaii,
Illinois, Kentucky (via its Governor), Massachusetts, Minnesota, New
Jersey, New York, North Carolina, Oregon, Rhode Island, Vermont, Vir-
ginia, and Washington. Colorado, Iowa, Michigan, and Nevada also
joined as additional state intervenors while this suit was on appeal.

all other portions of the ACA.

Ruling on what it construed as a plaintiffs' motion for partial summary judgment, the District Court declared the entire ACA unlawful. *Texas* v. *United States*, 340 F. Supp. 3d 579, 619 (ND Tex. 2018). It held that the individual plaintiffs had standing, that the individual mandate could no longer be sustained as a lawful exercise of Congress's taxing power, and that the mandate was inseverable from the remainder of the ACA, including the provisions that impose financial burdens on the state plaintiffs. *Id.,* at 592– 619.

On appeal, the Fifth Circuit affirmed in part and vacated in part. *Texas* v. *United States*, 945 F. 3d 355 (CA5 2019). It found that both the state plaintiffs and the individual plaintiffs had standing, and it agreed with the District Court that the individual mandate could no longer be sustained under the taxing power. But the Court of Appeals remanded the case and directed the District Court to reassess the broad relief it had ordered.

The state intervenors then filed a petition for a writ of certiorari seeking review of the Court of Appeals' interlocutory decision. The plaintiffs opposed interlocutory review, but filed a conditional cross-petition asking us to review the Court of Appeals' remand decision in the event that the Court granted the state intervenors' petition. This Court granted both petitions. 589 U. S. \_\_\_ (2020).

## II

We may consider the merits of this appeal if even one plaintiff has standing, *Little Sisters of the Poor*, 591 U. S., at \_\_\_, n. 6; *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 52, n. 2 (2006), but the majority concludes that no plaintiff—neither the States that originally brought suit nor the individual plaintiffs who later joined them—has standing under Article III of the

Constitution. That is a remarkable holding. While the individual plaintiffs' claim to standing raises a novel question, the States have standing for reasons that are straightforward and meritorious. The Court's contrary holding is based on a fundamental distortion of our standing jurisprudence.

## A

The governing rules are well-settled. To establish Article III standing, a plaintiff must show: (1) "an injury in fact"; (2) that this injury "is fairly traceable to the challenged conduct of the defendant"; and (3) that the injury "is likely to be redressed by a favorable judicial decision." *Spokeo*, *Inc.* v. *Robins*, 578 U. S. 330, 338 (2016); see also, *e.g.*, *Carney* v. *Adams*, 592 U. S. ___, ___ (2020) (slip op., at 4); *Hollingsworth* v. *Perry*, 570 U. S. 693, 704 (2013); *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992).

In the present suit, there is no material dispute that the States have satisfied two of these requirements. First, there is no question that the States have demonstrated an injury in fact. An injury in fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U. S., at 339 (internal quotation marks omitted). A financial or so-called "pocketbook" injury constitutes injury in fact, and even a small pocketbook injury—like the loss of $1—is enough. See *Czyzewski* v. *Jevic Holding Corp.*, 580 U. S. ___, ___ (2017) (slip op., at 11) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury'"). Here, the States have offered plenty of evidence that they incur substantial expenses in order to comply with obligations imposed by the ACA.

There is likewise no material dispute that these financial injuries could be redressed by a favorable judgment. The District Court declared the entire ACA unenforceable, and that judgment, if sustained, would spare the States from

the costs of complying with the ACA's provisions. So too would a more modest judgment limited to only those ACA provisions that directly burden the States.

The standing dispute in this suit thus turns on traceability. See *ante*, at 14–16. But once this requirement is properly understood, it is apparent that it too is met.

Our cases explain that traceability requires "a causal connection between the injury and *the conduct complained of*." *Lujan*, 504 U. S., at 560 (emphasis added). In other words, the injury has to be "'fairly . . . trace[able] to *the challenged action of the defendant*.'" *Ibid.* (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 41 (1976); emphasis added). We have repeatedly and consistently described the traceability inquiry this way. See *Spokeo*, 578 U. S., at 338 ("The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant"); *Hein* v. *Freedom From Religion Foundation, Inc.*, 551 U. S. 587, 598 (2007) (plurality opinion) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct" (internal quotation marks omitted)); *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 342 (2006) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct" (internal quotation marks omitted)); *Bennett* v. *Spear*, 520 U. S. 154, 162 (1997) (requiring "that the injury is fairly traceable to the actions of the defendant" (internal quotation marks omitted)); *Lujan*, 504 U. S., at 560 (requiring an injury "fairly traceable to the challenged action of the defendant" (internal quotation marks and alterations omitted)); *Allen* v. *Wright*, 468 U. S. 737, 757 (1984) (requiring an injury "fairly traceable to the Government conduct respondents challenge as unlawful").[5] Tracing injuries to particular conduct ensures that the properly adverse parties

_____

[5] There are dozens upon dozens of examples. Some recent cases include

are before the court and reinforces the traditional under-
standing of legal judgments. See *Massachusetts* v. *Mellon*,
262 U. S. 447, 488 (1923) ("If a case for preventive relief be
presented," what the court enjoins are "the acts of the offi-
cial" charged with the law's enforcement).

The States have clearly shown that they suffer concrete
and particularized financial injuries that are traceable to
conduct of the Federal Government. The ACA saddles them
with expensive and burdensome obligations, and those ob-
ligations are enforced by the Federal Government. That is
sufficient to establish standing. As the Court observed in
*Lujan*, when a party is "an object of the action . . . at issue,"
"there is ordinarily little question that the action . . . has
caused [that party] injury"—*i.e.*, that the injury is traceable
to that action—"and that a judgment preventing . . . the ac-
tion will redress it." 504 U. S., at 561–562. That is pre-
cisely the situation here. The state plaintiffs have shown
that they are the object of potential federal enforcement ac-
tions if they do not comply with costly and burdensome ob-
ligations that the ACA imposes.

Consider what the state plaintiffs have shown with re-
spect to the ACA reporting requirements codified at 26
U. S. C. §§6055 and 6056. These sections provide the basis
for the familiar 1094 and 1095 IRS tax forms. Section 6055
applies to those who "provid[e] minimum essential coverage
to an individual during a calendar year." Subsection (a) of
that provision requires that returns be filed with the IRS,
and subsection (c) requires that similar forms be provided

––––––––––

*Uzuegbunam* v. *Preczewski*, 592 U. S. ___, ___ (2021) (slip op., at 3); *Car-
ney* v. *Adams*, 592 U. S. ___, ___ (2020) (slip op., at 4); *Department of
Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op., at 9); *Virginia
House of Delegates* v. *Bethune-Hill*, 587 U. S. ___, ___ (2019) (slip op., at
3); *Gill* v. *Whitford*, 585 U. S. ___, ___ (2018) (slip op., at 13); *Town of
Chester* v. *Laroe Estates, Inc.*, 581 U. S. ___, ___ (2017) (slip op., at 5);
*Bank of America Corp.* v. *Miami*, 581 U. S. ___, ___ (2017) (slip op., at 5);
and *Czyzewski* v. *Jevic Holding Corp.*, 580 U. S. ___, ___ (2017) (slip op.,
at 9).

to covered individuals. Section 6056 similarly requires certain large employers to report to both the IRS and employees about whether they offer health insurance coverage. The States plainly have demonstrated standing to seek relief from these burdensome reporting obligations.

Start with injury in fact. The States have offered undisputed evidence documenting the ongoing financial costs of complying with these reporting requirements. Missouri, for example, offered a declaration attesting to spending $185,061 in fiscal year 2016 on Forms 1094 and 1095. App. 163. That declaration also attested to costs or projected costs of more than $45,000 for each fiscal year from 2017 through 2021. *Ibid.* South Dakota provided evidence of "ongoing" reporting costs totaling $100,000. *Id.*, at 187. Kansas offered evidence of more than $100,000 in reporting costs. *Id.*, at 142. These are just a few examples. See also, *e.g.*, *id.*, at 103 (Texas); *id.*, at 350–351 (Georgia). There is no question that these undisputed, ongoing financial costs qualify as injuries in fact. See *Jevic Holding Corp.*, 580 U. S., at \_\_\_ (slip op., at 11).

Now turn to traceability. Are these financial injuries "fairly traceable to the challenged conduct"? *Hollingsworth*, 570 U. S., at 704. The answer is clearly yes. The reporting requirements in §§6055 and 6056 are enforceable by the Federal Government, and noncompliance may result in heavy penalties. Section 6721(a)(1) of the Internal Revenue Code, for example, provides "a penalty" for the failure to complete an "information return," which includes reports required by §§6055(a) and 6056(a). See 26 U. S. C. §§6724(d)(1)(B)(xxiv), (xxv). And §6722(a)(1) provides "a penalty" for the failure to issue a "payee statement," which includes the reports required by §§6055(c) and 6056(c). See §§6724(d)(2)(GG), (HH). These penalties can amount to at least $280 per infraction, and they can quickly run up into the millions of dollars. See §§6721,

6722.[6]

That leaves redressability, which asks whether the requested relief is likely to redress the party's injury. *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 103 (1998). Looking to the relief the District Court in fact granted makes it obvious that the States' injuries in the form of ongoing reporting expenses are redressable. The District Court entered a judgment that, among other things, declared the reporting requirements in §§6055 and 6056 unenforceable. See 340 F. Supp. 3d, at 619. With that judgment in hand, the States would be freed from the obligation to expend funds to comply with those requirements—redressing their financial injury prospectively.

The state plaintiffs have similarly demonstrated standing to seek relief from ACA provisions requiring them to offer expensive health insurance coverage for their employees. Consider the ACA's requirement that group health plans and health insurance offerings extend coverage to adult children until they reach the age of 26. See 42 U. S. C. §300gg–14(a). Texas has spent more than $80 million complying with that rule. App. 81. Missouri has spent more than $10 million. *Id.*, at 159; *id.*, at 157 ("The Missouri Consolidated Health Care Plan is a non-federal governmental health plan which provides insurance coverage for most state employees"); *id.*, at 159 (Missouri will "indefinitely continue paying these additional costs").

These obligations, too, are backed by substantial enforcement mechanisms. For instance, the state plaintiffs generally must offer employees coverage that complies with §300gg–14 to avoid violating the employer mandate, see 26 U. S. C. §4980H, and the failure to comply would expose the States to penalties of thousands of dollars per employee each year, see §§4980H(a), (b), (c)(1). Similarly, the failure

—————————

[6] Willful failure to comply with the reporting requirements in §§6055 and 6056 can also result in criminal penalties. See 26 U. S. C. §7203.

to cover adult children would expose many state health plans to penalties under 42 U. S. C. §300gg–22(b)(2), and those penalties can amount to $100 per day for each person offered noncompliant coverage. *Ibid.* Thus, the States are presented with the choice of spending millions to cover adult children or risking untold sums for failing to do so.

In this way, the States' financial injuries from offering health coverage to adult children are traceable to the looming threat of enforcement actions. And those financial injuries can be prospectively redressed by a declaratory judgment making clear that the States are not, in fact, obligated to offer health coverage to children up to age 26.

While I have outlined two examples of concrete, traceable, and redressable injuries demonstrated by the state plaintiffs, these examples are not exhaustive. The ACA is an enormously complex statute, and the States have offered evidence of ongoing financial injuries relating to compliance with many other different (and enforceable) ACA provisions. See, *e.g.*, App. 81–86 (Texas's compliance costs); *id.*, at 139 (Kansas); *id.*, at 158–162, 165–170 (Missouri); *id.*, at 182–184 (South Carolina); *id.*, at 186–190 (South Dakota); *id.*, at 345–350 (Georgia).

B

The Court largely ignores the theory of standing outlined above. It devotes most of its attention to two other theories, see *ante*, at 4–14, and when it does address the relevant injuries, its arguments are deeply flawed.

The Court's primary argument rests on a patent distortion of the traceability prong of our established test for standing. Partially quoting a line in *Allen*, the Court demands a showing that the "*Government's conduct* in question is . . . 'fairly traceable' to enforcement of *the 'allegedly unlawful' provision of which the plaintiffs complain— §5000A(a).*" *Ante*, at 15 (quoting 468 U. S., at 751; emphasis added). This is a flat-out misstatement of the law and what

the Court wrote in *Allen*. What *Allen* actually requires is a "personal injury fairly traceable to *the defendant's allegedly unlawful conduct*," *id.*, at 751 (emphasis added). And what this statement means is that the plaintiff's "injury" must be traceable to the defendant's conduct, and that conduct must be "allegedly unlawful."[7] "Allegedly unlawful" means that the plaintiff must allege that the conduct is unlawful. (The States allege that the challenged enforcement actions are unlawful using a traditional legal argument, see *infra*, at 15–20.) But a plaintiff's standing (and thus the court's Article III jurisdiction) does not require a demonstration that the defendant's conduct is in fact unlawful. That is a merits issue.

If Article III standing required a showing that the plaintiff's alleged injury is traceable to (*i.e.*, in some way caused by) an unconstitutional provision, then whenever a claim of unconstitutionality was ultimately held to lack legal merit—even after a full trial—the consequence would be that the court lacked jurisdiction to entertain the suit in the first place. That would be absurd, and this Court has long resisted efforts to transform ordinary merits questions into threshold jurisdictional questions by jamming them into the standing inquiry. See, *e.g., Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. 787, 800 (2015); *Whitmore* v. *Arkansas*, 495 U. S. 149, 155 (1990); *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 624 (1989). "[S]tanding does not depend on the merits of a claim." *Davis* v. *United States*, 564 U. S. 229, 249, n. 10 (2011) (internal quotation marks and alterations omitted). And "'jurisdiction is not defeated by the possibility that the averments [in a complaint] might fail to state a cause of action on which petitioners could actually recover.'" *Steel Co.*, 523

---

[7] *Allen* repeated that point seven more times, see 768 U. S., at 752, 753, n. 19, 757–759, and that is precisely what countless other cases require, see *supra*, at 9–10, and n. 5. But the majority's rejection of the relevant theory of standing depends on this erroneous description of the law.

U. S., at 89 (quoting *Bell* v. *Hood*, 327 U. S. 678, 682 (1946); alterations omitted). Rather, if the challenged action is "allegedly unlawful," that suffices for standing purposes. *Allen*, 468 U. S., at 751; see also *Whitmore*, 495 U. S., at 155 ("Our threshold inquiry into standing in no way depends on the merits of the petitioner's contention that particular conduct is illegal" (internal quotation marks and alterations omitted)).

## C

The Court's distortion of the traceability requirement is bad enough in itself, but there is more. After imposing an obstacle that the States should not have to surmount to establish standing, the Court turns around and refuses to consider whether the States have cleared that obstacle. It's as if the Court told the States: "In order to bring your case in federal court, you have to pay a filing fee of $100,000, but we will not give you a chance to pay that money."

The Court says that the States cannot establish standing unless they show that their injuries are traceable to the individual mandate, and the States claim that their injuries are indeed traceable to the mandate. Their argument proceeds in two steps. First, they contend that the individual mandate is unconstitutional because it does not fall within any power granted to Congress by the Constitution. Second, they argue that costly obligations imposed on them by other provisions of the ACA cannot be severed from the mandate. If both steps of the States' argument that the challenged enforcement actions are unlawful are correct, it follows that the Government cannot lawfully enforce those obligations against the States.

There can be no question that this argument is conceptually sound. Imagine Statute ABC. Provision A imposes enforceable legal obligations on the plaintiff. Provision B imposes a legal obligation on a different party. And provision

C provides that a party is not obligated to comply with pro-
vision A if provision B is held to be unconstitutional. Based
on the plain text of this law, a party subject to provision A
should be able to obtain relief from the enforcement of pro-
vision A if it can show that provision B is unconstitutional.
To hold otherwise would be directly contrary to the statu-
tory text. But the Court's reasoning would make such a
claim impossible. The plaintiff would be thrown out of court
at the outset of the case for lack of standing.

That cannot be right. And if the Court really means to
foreclose all such claims from now on, that is a big change
because we have repeatedly heard such arguments and
evaluated them on the merits. See Lea, Situational Sever-
ability, 103 Va. L. Rev. 735, 769 (2017) (explaining that
similar "claims are a longstanding feature of American ju-
risprudence").

In *Seila Law LLC* v. *Consumer Financial Protection Bu-
reau*, 591 U. S. ___ (2020), a law firm resisted the CFPB's
efforts to enforce a civil investigative demand. The firm ar-
gued that (A) it was harmed by actions taken under statu-
tory provisions authorizing the Bureau to issue civil inves-
tigative demands; (B) the Bureau's Director, under whose
authority the demands had been issued, was protected by
an unlawful removal restriction; and (C) the removal re-
striction was inseverable from the investigative provisions.
The Court did not decide the severability issue at the stand-
ing stage. Instead, it properly treated severability as a mer-
its issue, held that the removal restriction was unlawful,
and considered whether relief could be granted because the
investigative provisions were inseverable from the removal
restriction. *Id.*, at ___–___ (opinion of the Court) (slip op.,
at 11–30); *id.*, at ___–___ (plurality opinion) (slip op., at 30–
36).

Indeed, the *Seila Law* Court had little trouble dismissing
the same misguided approach to traceability that the ma-
jority adopts today. The court-appointed *amicus* suggested

that there was lack of traceability because there was no proof that the injury was caused by the removal restriction. "Our precedents say otherwise," we explained, as a "plaintiff's injury must be fairly traceable to the challenged action of the defendant," and it is "sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority." *Id.*, at \_\_\_–\_\_\_ (opinion of the Court) (slip op., at 9–10) (internal quotation marks and alterations omitted). Not a single Justice disputed that conclusion.

In *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010), an accounting firm challenged the power of the Public Company Accounting Oversight Board to regulate the accounting industry and investigate its activities. The firm argued that (A) it was harmed by the actions taken under statutory provisions that gave the Board regulatory and investigatory authority; (B) other provisions unlawfully insulated Board members with dual-layer for-cause removal restrictions; and (C) the removal provisions were inseverable from provisions authorizing the pertinent regulatory activities. The Court entertained this argument on the merits, concluding that the removal restriction was unlawful, *id.*, at 492–508, but rejecting the argument that the removal provision was inseverable from the provisions authorizing the actions that directly harmed the firm, *id.*, at 508–510. While the Court's severability determination meant that the accounting firm was "not entitled to broad injunctive relief against the Board's continued operations," *id.*, at 513, no one questioned the firm's standing to seek that relief in the first place.

In *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172 (1999), several Bands of Chippewa Indians sought a declaratory judgment that an 1837 Treaty gave their members a right to hunt on historic Chippewa lands. An 1850 Executive Order had purported to revoke those

hunting rights, but the Bands argued that (A) one portion
of the Executive Order purported to extinguish their hunt-
ing rights; (B) a different portion of the Executive Order—
the "removal order," which had nothing to do with hunting
rights—was unlawful; and (C) the hunting rights revoca-
tion was inseverable from the removal order and thus inef-
fective. The Court entertained this argument on the merits
and granted relief. It first assumed "that the severability
standard for statutes also applies to Executive Orders." *Id.*,
at 191. Then it determined that there was "no statutory or
constitutional authority" for the removal order and that the
"Executive Order was insufficient to [revoke hunting
rights] because it was not severable from the invalid re-
moval order." *Id.*, at 193, 195. In other words, the Bands
obtained relief with the same type of argument the state
plaintiffs press here.

In *New York* v. *United States*, 505 U. S. 144, 186 (1992),
the State of New York challenged three provisions of the
Low-Level Radioactive Waste Policy Amendments Act of
1985, 99 Stat. 1842, 42 U. S. C. §2021b *et seq*. Significant
for present purposes, the Court accepted New York's chal-
lenge to one of those provisions, 505 U. S., at 174–177, and
rejected its challenges to two others, *id.*, at 171–174, 183–
186. But the Court did not stop there. Instead, it went on
to consider whether New York nonetheless could obtain re-
lief from the other two provisions on the ground that those
provisions were inseverable from the unlawful provision
and thus unenforceable. *Id.*, at 186–187; see *Printz* v.
*United States*, 521 U. S. 898, 935 (1997) (explaining that
*New York* "address[ed] severability where remaining provi-
sions at issue affected the plaintiffs"). In other words, the
Court considered whether New York could obtain relief
from the enforcement of independently constitutional pro-
visions where a statute contained (A) two independently
constitutional provisions; (B) an unconstitutional provision;

and (C) the constitutional provisions were arguably inseverable from the unconstitutional provision.

In *Alaska Airlines, Inc.* v. *Brock*, 480 U. S. 678 (1987), a group of airlines challenged provisions of the Airline Deregulation Act of 1978, 92 Stat. 1705, that benefited airline employees. The airlines argued that (A) enforcement of and regulations under those provisions injured them; (B) the Airline Deregulation Act also contained an unlawful legislative veto; and (C) the employee-benefit provisions were "ineffective" because they were inseverable from the legislative veto provision, 480 U. S., at 680. This Court considered and unanimously rejected the airlines' argument on the merits of the severability question, *id.*, at 687–697, but no one questioned the airlines' standing to seek relief.

The Court's treatment of these arguments in the cases just discussed is not a modern innovation. In *El Paso & Northeastern R. Co.* v. *Gutierrez*, 215 U. S. 87 (1909), for example, a railway company challenged a portion of the Employers' Liability Act of 1906, 34 Stat. 232, that preempted territorial law more favorable to the railway. The company argued that (A) a portion of the Act governing U. S. Territories exposed it to liability in the suit; (B) other portions affecting intrastate commerce exceeded Congress's Commerce Clause power; and (C) the first portion could not be applied because it was inseverable from the unconstitutional portions. The Court agreed that the interstate commerce aspects of the Act were unlawful, but held that they were severable from the territorial provision. 215 U. S., at 93–98.

In *Marshall Field & Co.* v. *Clark*, 143 U. S. 649 (1892), three importers challenged the collection of tariffs under the McKinley Tariff Act. See Act of Oct. 1, 1890, 26 Stat. 567. They argued that (A) several provisions of the Act imposed tariffs on goods they imported; (B) §3 of the Act unlawfully delegated legislative powers to the President by permitting him to suspend the free importation of other

types of goods; and (C) §3 was inseverable from the provisions imposing tariffs on the goods they imported. The Court heard the argument on the merits and, after extensive analysis, rejected the non-delegation challenge to §3. *Id.*, at 680–694. Because §3 was lawful, the Court did not "enter upon the consideration" of whether "other parts of the act, those which directly imposed duties upon articles imported, would be inoperative" if §3 were unlawful. *Id.*, at 694.

Similarly, in the *Trade-Mark Cases*, 100 U. S. 82 (1879), this Court reviewed a series of criminal prosecutions for alleged violations of an 1876 criminal law prohibiting the "fraudulent use, sale, and counterfeiting of trade-marks," *id.*, at 92. The Court held that (A) the prosecutions under the 1876 Act could not proceed because (B) an 1870 Act creating the underlying trademark rights exceeded Congress's powers under the Commerce Clause, *id.*, at 95–98, and (C) the 1876 Act underlying the prosecutions was inseverable from the 1870 Act and thus "falls with it," *id.*, at 99.

There is nothing novel about the state plaintiffs' claims. What is new and revolutionary is the rule the Court has concocted to sink those claims.

## D

The Court has no real response to the arguments set out above, so it falls back on the claim that the States forfeited those arguments because they (1) did not "directly" argue them in the courts below, (2) did not present them at the certiorari stage, and (3) did not raise them in this Court. See *ante*, at 10. JUSTICE THOMAS makes a forfeiture argument expressly. See *ante*, at 4–6, and nn. 1–2 (concurring opinion).[8] There is nothing to any of these arguments.

_____

[8] In addition to claiming that the States forfeited the standing theory set out in this dissent, JUSTICE THOMAS's concurrence lists several additional reasons why we should not address that theory. None is persuasive.

ALITO, J., dissenting

Consider the States' standing to seek relief from the IRS reporting obligations. The States identified these costs in their complaint, see App. 58–60, Amended Complaint ¶41(i); offered extensive evidence of these costs on summary judgment, see *supra*, at 10–11; and argued that these provisions cannot be severed from the individual mandate, see, *e.g.*, App. 63, Amended Complaint ¶57 ("The remainder of the ACA is non-severable from the individual mandate, meaning that the Act must be invalidated as a whole"). They expressly advanced that argument in the Court of Appeals, see Brief for State Appellees in *Texas* v. *United States*, No. 19–10011 (CA5), pp. 23–24, 36–50, and the Court of Appeals accepted it for standing purposes, see 945 F. 3d, at 384–387. In this Court, the States argued that

––––––––––

The concurrence invokes the rule that merits decisions that do not discuss jurisdiction are not of precedential value on jurisdictional issues. *Ante*, at 5. This argument is apparently a response to the many cases (141 years' worth) in which this Court reached the merits of claims structured like those of the state plaintiffs in the suit at hand. See *supra*, at 16–20. The suggestion, I take it, is that the plaintiffs in those cases may have lacked standing and that therefore this Court erred in reaching the merits. To put the point lightly, that seems unlikely, and even if our prior decisions have not expressly embraced a standing theory like the States', there is no reason why a conceptually sound theory should be rejected just because we never previously saw fit to register express approval.

JUSTICE THOMAS states that "this Court has been inconsistent in describing whether inseverability is a remedy or merits question." *Ante*, at 5. But all that matters for present purposes is that inseverability is not a standing question. And in all events, the concurrence elsewhere recognizes that severability is a merits question. See *ante*, at 6 ("[S]tanding-through-inseverability could only be a valid theory of standing to the extent it treats inseverability as a merits exercise of statutory interpretation"); *ante,* at 5, n. 2 (treating severability as a merits question under the framework set forth in *Steel Co.*, 523 U. S., at 89).

Finally, JUSTICE THOMAS suggests that a lack of argument on severability "poses a significant obstacle to review," *ante*, at 5, n. 2, but that flatly ignores that each party—not to mention many *amici*—extensively briefed the severability question in this Court.

they have standing based on these reporting obligations in their brief opposing the petition filed by California and the other parties that intervened to defend the ACA, see Brief in Opposition 17, and in their merits brief, see Brief for Respondent/Cross-Petitioner States 20–22. They specifically identified the consequences of noncompliance to which these injuries are traceable, *id.*, at 22 ("Employers can be sanctioned by the IRS for failing to submit adequate information. . . . In other words, state respondents are compelled under threat of government sanction to produce [the] forms"). And they argued that these obligations are not enforceable because they are inseverable from the individual mandate, *id.*, at 36–46; see also *id.*, at 26–27 (discussing *Alaska Airlines*, 480 U. S. 678).

For these reasons, it is clear that the States did not forfeit the arguments discussed in this dissent.[9]

* * *

I would hold that the States have demonstrated standing to seek relief from the ACA provisions that burden them and that they claim are inseparable from the individual mandate.

## III

Because the state plaintiffs have standing, I proceed to consider the merits of this lawsuit. That requires assessing whether the individual mandate is unlawful and whether it

———————

[9] If the effect of the Court's decision is dismissal of this action for lack of Article III jurisdiction, the States may file a new action. See 18A C. Wright & A. Miller, Federal Practice and Procedure §4436 (3d ed. 2020) ("The basic rule that dismissal for lack of subject-matter jurisdiction does not preclude a second action . . . is well settled"); *Hughes* v. *United States*, 4 Wall. 232, 237 (1866) ("If the first suit was dismissed for . . . want of jurisdiction . . . the judgment rendered will prove no bar to another suit"); *Lopez* v. *Pompeo*, 923 F. 3d 444, 447 (CA5 2019). And in any event, many other parties will have standing to bring such a claim based on a variety of the ACA's substantive provisions that are arguably inseverable from the mandate. Our Affordable Care Act epic may go on.

is inseverable from the provisions that burden the States.

I begin with the question whether the individual mandate falls within a power granted to Congress under Article I of the Constitution. The Constitution's text and our precedent compel the conclusion that it does not.

The Federal Government "is acknowledged by all to be one of enumerated powers." *McCulloch* v. *Maryland*, 4 Wheat. 316, 405 (1819) (Marshall, C. J., for the Court). Article I of the Constitution does not give Congress "plenary legislative power." *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 15). Instead, it enumerates certain legislative powers that, while "sizeable," are not "unlimited." *Ibid.*

When the constitutionality of the individual mandate was first challenged in *NFIB*, the Government's primary defense was that it represented a valid exercise of Congress's power to regulate interstate commerce, but a majority of the Court squarely rejected that argument. See 567 U. S., at 572 (opinion of the Court) ("The Court today holds that our Constitution protects us from federal regulation under the Commerce Clause so long as we abstain from the regulated activity"); see also *id.*, at 561 (opinion of ROBERTS, C. J.) ("The commerce power thus does not authorize the mandate"); *id.*, at 648 (joint dissent) ("The Act before us here exceeds federal power . . . in mandating the purchase of health insurance"). Likewise, a majority of the Court rejected the Government's resort to the Necessary and Proper Clause. See *id.*, at 560 (opinion of ROBERTS, C. J.); *id.*, at 655 (joint dissent). I agreed with those holdings at the time, and that is still my view. The mandate cannot be sustained under the Commerce Clause or the Necessary and Proper Clause, and in this suit, no party urges us to uphold it on those grounds.

While the *NFIB* Court rejected the Government's Commerce Clause argument, a majority held that the mandate represented a lawful exercise of Congress's taxing power,

see *id.*, at 575 (opinion of ROBERTS, C. J.); see also *id.*, at 574 (opinion of the Court), and the House and state intervenors now argue that the mandate can still be sustained on this ground despite the fact that the "tax" it supposedly imposes is now set at zero.  In *NFIB*, I did not see how the mandate's penalty could be understood as a tax, see *id.*, at 661–669 (joint dissent), but assuming for the sake of argument that the majority's understanding was correct at the time, it is now indefensible.

The Constitution grants Congress the power to "lay and collect Taxes" "to pay the Debts and provide for the common Defence and general Welfare of the United States."  Art. I, §8, cl. 1.  In *NFIB*, the Court made clear that "the essential feature of any tax" is that it "produces at least some revenue for the Government."  567 U. S., at 564 (opinion of the Court).  That limitation follows from the text of the provision.  A tax cannot assist in paying debts or providing for the general welfare or defense if it raises no money.  Moreover, the concept of laying and collecting taxes plainly entails the collection of revenue.  At the founding, to "lay" in the relevant sense meant to "assess; to charge; to impose." 2 N. Webster, An American Dictionary of the English Language (1828) (Webster); see also S. Johnson, A Dictionary of the English Language (10th ed. 1792) (Johnson) ("To charge as a payment").  To "collect" meant to "gather money or revenue from debtors; to demand and receive."  1 Webster; see also Johnson ("To gather together").  And a "tax" was a "rate or sum of money" assessed on certain persons or property.  2 Webster.  Read together, this language means that Congress is empowered to pass laws that raise revenue.

In recognizing that raising revenue is an "essential feature" of any exercise of the taxing power, *NFIB* built on a substantial line of precedent.  See *Department of Revenue of Mont.* v. *Kurth Ranch*, 511 U. S. 767, 778 (1994); *United States* v. *Kahriger,* 345 U. S. 22, 28, and n. 4 (1953); *United*

*States* v. *Sanchez*, 340 U. S. 42, 44 (1950); *Sonzinsky* v. *United States*, 300 U. S. 506, 513–514 (1937); *A. Magnano Co.* v. *Hamilton*, 292 U. S. 40, 46 (1934). Indeed, the state intervenors and the House have not identified any statute ever passed under the taxing power that did not raise revenue. *Virginia Office for Protection and Advocacy* v. *Stewart*, 563 U. S. 247, 260 (2011) ("Lack of historical precedent can indicate a constitutional infirmity . . . "); see *Seila Law*, 591 U. S., at \_\_\_–\_\_\_ (slip op., at 18–21); *Free Enterprise Fund*, 561 U. S., at 505. Given this text, history, and precedent, it is no longer defensible to argue that the individual mandate can be construed as a lawful exercise of Congress's taxing power, for as it now stands, the mandate will never "produc[e] at least some revenue for the Government." *NFIB*, 567 U. S., at 564 (opinion of the Court). The penalty for noncompliance is set at 0% and $0. It cannot raise a cent.

The state intervenors and the House offer several other arguments to sustain the mandate, but each fails. First, they suggest that we should interpret the individual mandate as an exercise of the taxing power based solely on the precedential effect of the Court's decision in *NFIB*. But THE CHIEF JUSTICE's opinion for the Court in *NFIB* construed the mandate as a tax only because the individual mandate "produce[d] at least some revenue for the Government." *Ibid.* With that "essential feature" removed, this construction is foreclosed.

Second, the state intervenors and the House argue that the Taxing Clause permits Congress to pass a tax and subsequently reduce it to zero. But Congress cannot supplement its powers through the two-step process of passing a tax and then removing the tax but leaving in place a provision that is otherwise beyond its enumerated powers.

Third, they analogize the mandate to a delayed or suspended tax—one that raises no revenue now but could do so in the future. But §5000A, as it currently stands, does not

delay or suspend the collection of revenue. Unless Congress amends that provision and provides for it to begin raising revenue at some future date, the "tax" is permanently set at zero.

The state intervenors offer one final defense of the individual mandate: Even if it cannot be sustained under the Commerce Clause, Taxing Clause, or Necessary and Proper Clause, they argue that we should interpret the mandate as a mere precatory statement. In their view, Congress is free to urge Americans to take actions that it could not constitutionally require, and that is all it has done here.

This argument fails because the individual mandate is not a precatory statement. The text of the provision is clear. It states that every covered individual "shall . . . ensure that the individual, and any dependent of the individual . . . , is covered under minimum essential coverage . . . ." 26 U. S. C. §5000A(a). "Shall" typically means must, not should. See *Kingdomware Technologies*, *Inc.* v. *United States*, 579 U. S. 162, 171–172 (2016). And the text confirms that "shall" means "must" by terming the individual mandate a "[r]equirement to maintain minimum essential coverage." §5000A(a); see also *NFIB*, 567 U. S., at 663 (joint dissent) (providing other statutory references to the individual mandate as a requirement).

Mere precatory provisions, by contrast, typically use the word "should" to signify that they are not mandatory, *e.g.*, 4 U. S. C. §8(c) ("The flag should never be carried flat or horizontally, but always aloft and free"), or make clear that they convey only the "sense of Congress," *e.g.*, 15 U. S. C. §7807 ("It is the sense of Congress that States should enact the Uniform Athlete Agents Act of 2000"). Congress adopted those very formulations elsewhere in the ACA, see, *e.g.*, 42 U. S. C. §292s(d) ("It is the sense of Congress that funds repaid under the loan program . . . should not be transferred to the Treasury"), but chose markedly different language when crafting the individual mandate. Because

the individual mandate is, in fact, a mandate, it cannot be considered a mere suggestion to purchase insurance.

For these reasons, I conclude that the individual mandate exceeds the scope of Congress's enumerated legislative powers.

## IV

This brings me to the next question: whether the state plaintiffs have shown that the provisions of the ACA imposing burdens on them are inseparable from the unconstitutional individual mandate. I conclude that those provisions are inextricably linked to the individual mandate and that the States have therefore demonstrated on the merits that those other provisions cannot be enforced against them. Accordingly, the States are entitled to a judgment providing that they are not obligated to comply with the ACA provisions that burden them.

All the opinions in *NFIB* acknowledged the central role of the individual mandate's tax or penalty. In brief, the ACA aimed to achieve "near-universal" health-care coverage. 42 U. S. C. §18091(2)(D). A major obstacle was the inability of many individuals to obtain adequate insurance due to the expensive medical care they were likely to require. To address that problem, the ACA included "guaranteed issue" and "community rating" provisions. These key provisions prohibit insurance companies from denying coverage or charging higher premiums to the individuals described above. And to compensate for the financial impact of these provisions on insurers, the individual mandate required the purchase of insurance by persons whose predicted medical expenses were substantially lower than the premiums they would pay. See *NFIB*, 567 U. S., at 547–548 (opinion of ROBERTS, C. J.); *id.*, at 595–599 (opinion of Ginsburg, J.); *id.*, at 648–651, 691–696 (joint dissent); see also *King*, 576 U. S., at 482 ("Congress found that the guaranteed issue

and community rating requirements would not work without the" individual mandate).

Thus, the guaranteed-issue and community-rating provisions were crucial to the success of the ACA scheme, and a tax or penalty for noncompliance with the individual mandate was essential to the ACA's distribution of risks and burdens. The ACA contains an express finding on exactly that point:

> "The requirement [*i.e.*, the individual mandate] is *essential* to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." 42 U. S. C. §18091(2)(I) (emphasis added).

See also *NFIB*, 567 U. S., at 694–696 (joint dissent) (describing other statutory provisions declaring that the individual mandate works "together" with the rest of the ACA).

In *NFIB*, the Government agreed that the individual mandate was inextricably related to those crucial provisions. See *id.*, at 650 (citing Brief for Petitioners, O. T. 2011, No. 11–398, p. 24). And so did Justice Ginsburg's opinion. See 567 U. S., at 597 ("[T]hese two provisions [*i.e.*, the guaranteed-issue and community-rating provisions], Congress comprehended, could not work effectively unless individuals were given a powerful incentive to obtain insurance"); see also *ibid.* (quoting congressional testimony that the insurance market would be "'drive[n] . . . into extinction'" without "'a *mandate on individual[s] to be insured*'").

Recognizing this relationship, the joint dissent, after finding that the individual mandate and Medicaid expansion provision were unconstitutional, concluded that other provisions of the ACA could not be enforced. We analyzed this question under what we described as the Court's "'well established'" two-part test. *Id.*, at 692 (joint dissent) (quoting *Alaska Airlines*, 480 U. S., at 684).

Under this test, the first question was whether the remainder of the ACA would "operate in the manner Congress intended" without the unconstitutional provisions. *NFIB*, 567 U. S., at 692. And to satisfy this requirement, we explained, it was not enough that the remaining provisions could operate by themselves "in some coherent way." *Ibid.* The question, instead, was whether those provisions would operate as Congress wrote them. *Ibid.* If this requirement was met, the second part of the test asked whether "Congress would have enacted [the other provisions] standing alone and without the unconstitutional portion." *Id.*, at 693; see *id.,* at 692–694.

Applying this test, we concluded that, without the unconstitutional provisions, neither the other ACA provisions we labeled "major" nor many of those we described as "minor" could operate as Congress intended. *Id.*, at 697–705. And we opined that Congress would not have enacted the remaining minor provisions by themselves. *Id.*, at 704–705. We noted that they had been adopted as part of a complex package deal and that "[t]here [was] no reason to believe that Congress would have enacted them independently." *Id.*, at 705.

Nothing that has happened since that decision calls for a different conclusion now. It is certainly true that the repeal of the tax or penalty has not caused the collapse of the entire ACA apparatus, but the critical question under the framework applied in the *NFIB* dissent is not whether the ACA could operate in *some* way without the individual mandate but whether it could operate in anything like the manner Congress designed. The answer to that question is clear. When the tax or penalty was collected, costs were shifted from individuals previously denied coverage due to their medical conditions and placed on others who purchased insurance only because the failure to do so was taxed or penalized. The repeal of the tax or penalty has not made the costs of the guaranteed-issue and community-

rating requirements disappear. Those costs have obviously been shifted to others—in all likelihood to individuals who now pay higher premiums or face higher deductibles or to the taxpayers. This shift fundamentally changed the operation of the scheme Congress adopted.

The repeal of the tax or penalty also provides no reason to doubt our previous conclusion about Congress's intent. While the 2017 Act repealed the tax or penalty, it did not alter the statutory finding noted above, and the 2017 Act cannot plausibly be viewed as the manifestation of a congressional intent to preserve the ACA in altered form. The 2017 Act would not have passed the House without the votes of the Members who had voted to scrap the ACA just a few months earlier,[10] and the repeal of the tax or penalty, which they obviously found particularly offensive, was their fallback option. They eliminated the tax or penalty and left the chips to fall as they might. Thus, under the reasoning of the *NFIB* dissent, the provisions burdening the States are inseverable from the individual mandate.

The same result follows under the new approach to questions of partial unconstitutionality that some Members of the Court have adopted in the years since *NFIB*. They have suggested the severability analysis should track ordinary rules of statutory interpretation. *Seila Law*, 591 U. S., at ___, ___–___ (THOMAS, J., concurring in part and dissenting in part) (slip op., at 16, 20–21). In their view, Congress decides whether the provisions it enacts are linked to one another or not, and the answer lies in the ordinary tools of statutory construction. And everything the *NFIB* dissenters said points to the same conclusion as a matter of the ACA's text, history, and structure. The relevant provisions were passed as a comprehensive exercise of Congress's

––––––––––

[10] Compare 163 Cong. Rec. H4171 (May 4, 2017) (passage of the American Health Care Act, H. R. 1628), with *id.,* at H10312 (Dec. 20, 2017) (passage of the Tax Cuts and Jobs Act, H. R. 1).

Commerce Clause and (arguably) Taxing Clause powers. Those powers cannot justify the individual mandate. The statutory text says the individual mandate is "essential" to the overall scheme, 42 U. S. C. §18091(2)(I), and it repeatedly states that the various provisions work "together," *NFIB*, 567 U. S., at 694–696 (joint dissent). It does not matter that this language appears in a section entitled "findings" as opposed to a section entitled "severability." Congress can link distinct provisions in any number of ways, on this view, so long as it does so in the text. The broader statutory history and structure, moreover, reinforce that conclusion. The *NFIB* dissent explained how the ACA's provisions work in tandem to alter the insurance market. 567 U. S., at 691–706. Here, the individual mandate requires individuals to obtain "minimum essential coverage." 26 U. S. C. §5000A(f). The reporting requirements, in turn, implement the mandate—indeed, they explicitly cross-reference §5000A—by requiring employers to provide information about such coverage. §§6055(e), 6056(b)(2)(B). And the adult-children coverage requirement works as part of a cohesive set of insurance reforms central to the ACA's overall structure, which turns on healthy persons' entry into the market via the individual mandate. See 42 U. S. C. §300gg–14(a). The individual mandate is thus inseverable from the provisions burdening the States under either approach to severability.

Having determined that the individual mandate is (1) unlawful and (2) inseverable from the provisions burdening the state plaintiffs, the final question is what to do about it. The answer largely flows from everything I have already said above. Relief in a case runs against parties, not against statutes. *Supra*, at 9–10. And provisions that are inseverable from unconstitutional features of a statute cannot be enforced. *Supra*, at 15–20. No matter how one approaches the question, then, the answer is clear: Because the mandate is unlawful and because the injury-causing

provisions are inextricably linked to the mandate, the federal defendants cannot enforce those provisions against the state plaintiffs. And the state plaintiffs are entitled to a judgment providing as much. That answer comports with the reasoning of the *NFIB* joint dissent, which made clear that the state plaintiffs should not be required to comply with the provisions of the ACA that burden them. See 567 U. S., at 697–707. And it comports with the remedial approach others have advocated in recent years. See *Murphy*, 584 U. S., at ___ (THOMAS, J., concurring) (slip op., at 3); *Seila Law*, 591 U. S., at ___ (opinion of THOMAS, J.) (slip op., at 24); *Barr* v. *American Assn. of Political Consultants*, *Inc.*, 591 U. S. ___, ___ (2020) (GORSUCH, J., concurring in judgment in part and dissenting in part) (slip op., at 5). Thus, under either the framework used in the *NFIB* joint dissent or the alternative framework advocated in subsequent cases, the state plaintiffs are entitled to relief freeing them from compliance with the ACA provisions that burden them.

\*    \*    \*

No one can fail to be impressed by the lengths to which this Court has been willing to go to defend the ACA against all threats. A penalty is a tax. The United States is a State. And 18 States who bear costly burdens under the ACA cannot even get a foot in the door to raise a constitutional challenge. So a tax that does not tax is allowed to stand and support one of the biggest Government programs in our Nation's history. Fans of judicial inventiveness will applaud once again.

But I must respectfully dissent.